1
2
3
4
5

MICHAEL J. HADDAD (SBN 189114)
JULIA SHERWIN (SBN 189268)
TERESA ALLEN (SBN 264865)
BRIAN HAWKINSON (SBN 341856)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, CA 94612
Telephone:    (510) 452-5500
Facsimile:    (510) 452-5510

6

7

Attorneys for Plaintiffs

8

9

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

ANTHONY GALLEY, Deceased, by and through his
Co-Successors in Interest, P.P. and B.P., minors,
through their mother and Next Friend, Christina
O'Neil, Individually and as Co-Successors in Interest
for ANTHONY GALLEY, Deceased,

                    Plaintiffs,

        vs.

COUNTY OF SACRAMENTO, a public entity;
FORMER SACRAMENTO COUNTY SHERIFF
SCOTT R. JONES, in his individual capacity; Jail
Commander ANTHONY PAONESSA, Jail Medical
Director VEER BABU, M.D., MAXIM
HEALTHCARE SERVICES, INC. dba MAXIM
STAFFING SOLUTIONS, a Maryland Corporation;
MAXIM HEALTHCARE STAFFING SERVICES,
INC., a Maryland Corporation; ERICA WOODS,
R.N., and DOES 1–20; individually, jointly, and
severally,

                    Defendants.

Case No. 2:23-cv-00325-WBS-AC

**FIRST AMENDED COMPLAINT
FOR DAMAGES,
DECLARATORY &
INJUNCTIVE RELIEF, AND
DEMAND FOR JURY TRIAL**

25
26
27
28

Plaintiffs, by and through their attorneys, HADDAD & SHERWIN LLP, for their First Amended Complaint against Defendants, state as follows:

## JURISDICTION

1.     This is a civil rights wrongful death/survival action arising from Defendants' deliberate indifference to the serious medical and mental health needs of pretrial detainee, ANTHONY GALLEY, resulting in his death on February 15, 2022, at Sacramento County Main Jail.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act ("ADA") – 42 U.S.C. § 12132 and 28 C.F.R. §35, et seq., the Rehabilitation Act ("RA") – 29 U.S.C. § 794, et seq., and the laws and Constitution of the State of California.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.  Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law.  **Plaintiffs file this First Amended Complaint as of right pursuant to Fed. R. Civ. Proc 15 (a)(1)(B).**

## INTRADISTRICT ASSIGNMENT

2.     A substantial part of the events and/or omissions complained of herein occurred in the city of Sacramento, Sacramento County, California, and, pursuant to Eastern District of California Civil Local Rule 100(d), this action is properly assigned to the Sacramento Division of the United States District Court for the Eastern District of California.

## PARTIES AND PROCEDURE

3.     Plaintiff P.P. is the fourteen-year-old daughter of Decedent ANTHONY GALLEY. and a resident of the State of Hawaii.  Plaintiff P.P., a minor, brings these claims through her mother and Next Friend, Christina O'Neil, individually and as Co-Successor in Interest for her father, Decedent ANTHONY GALLEY, pursuant to California Code of Civil Procedure §§ 377.10 *et seq.* and federal civil rights laws.  Decedent ANTHONY GALLEY was unmarried at the time of his death.  A Co-Successor in Interest declaration was previously filed (doc. 8).  Christina O'Neil is not a plaintiff in this action; she appears only in a representative capacity for her children as their Next Friend, as permitted by Fed. R. Civ. Proc 17 (c)(2) and Local Rule 200 (a)(3).  No appointment of a

guardian ad litem is necessary to ensure the adequate representation of the minors, P.P. and B.P., because Rule 17 explicitly provides that "[a] minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem," and because, (a) Christina O'Neil is the mother of minor Plaintiffs P.P. and B.P, with full custody and legal rights to make legal decisions for the minor Plaintiffs, who reside with her, and she agrees to represent her children's interest in this matter as their Next Friend; (b) there is no other person with a closer relationship of care to these minor Plaintiffs; (c) Christina O'Neil retained the law firm of Haddad & Sherwin LLP on behalf of her children to represent her children's interests in this matter; (d) Christina O'Neil has no personal interest in this matter; (e) Christina O'Neil understands that any settlement or resolution of this matter for her children, the minor Plaintiffs, will require court oversight and approval; and (f) Christina O'Neil will receive no compensation whatsoever for her services as Next Friend for her children in this matter, and will receive no part of any settlement or judgment her children may receive.

4.      Plaintiff B.P. is the eight-year-old son of Decedent ANTHONY GALLEY, and a resident of the State of Hawaii.  Plaintiff B.P., a minor, brings these claims through his mother and Next Friend, Christina O'Neil, individually and as Co-Successor in Interest for his father, Decedent ANTHONY GALLEY, pursuant to California Code of Civil Procedure §§ 377.10 *et seq*. and federal civil rights laws.  A Co-Successor in Interest declaration was previously filed (doc. 7). Christina O'Neil is not a plaintiff in this action; she appears only in a representative capacity for her children as their Next Friend, as permitted by Fed. R. Civ. Proc 17 (c)(2) and Local Rule 200 (a)(3). No appointment of a guardian ad litem is necessary to ensure the adequate representation of the minors, P.P. and B.P., because Rule 17 explicitly provides that "[a] minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem," and because, (a) Christina O'Neil is the mother of minor Plaintiffs P.P. and B.P, with full custody and legal rights to make legal decisions for the minor Plaintiffs, who reside with her, and she agrees to represent her children's interest in this matter as their Next Friend; (b) there is no other person with a closer relationship of care to these minor Plaintiffs; (c) Christina O'Neil

retained the law firm of Haddad & Sherwin LLP on behalf of her children to represent her children's interests in this matter; (d) Christina O'Neil has no personal interest in this matter; (e) Christina O'Neil understands that any settlement or resolution of this matter for her children, the minor Plaintiffs, will require court oversight and approval; and (f) Christina O'Neil will receive no compensation whatsoever for her services as Next Friend for her children in this matter, and will receive no part of any settlement or judgment her children may receive.

5.      Plaintiffs bring these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions.  Plaintiffs also bring their claims individually and on behalf of Decedent ANTHONY GALLEY on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, ADA, RA, federal and state civil rights law, and California law.  Plaintiffs also bring these claims as Private Attorneys General, to vindicate not only their rights and ANTHONY GALLEY's rights, but others' civil rights of great importance.

6.      Defendant COUNTY OF SACRAMENTO ("COUNTY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, the COUNTY operates the Sacramento County Sheriff's Office ("SCSO") and the Sacramento County jails.  At all relevant times, the COUNTY's Department of Health Services was responsible for providing medical and mental healthcare services to pretrial detainees and inmates at Sacramento County jails, including MR. GALLEY, through their Adult Correctional Health ("ACH") division.  Defendant COUNTY at all times had a non-delegable duty to provide a constitutional level of medical and psychiatric care to its jail inmates, which included among other duties, to provide competent medical staff at its jails.

7.      Defendant FORMER SHERIFF SCOTT R. JONES ("JONES"), at all times mentioned herein, was employed by Defendant COUNTY as Sheriff, and he was acting within the course and scope of that employment.  In that capacity, Defendant JONES was a policy making official for the COUNTY.  Further, Defendant JONES was ultimately responsible for the provision of medical and mental health care to inmates at the COUNTY jails, including assessment of inmates

for medical emergencies, medical needs, and mental health needs, and all COUNTY policies, procedures, customs, hiring, staffing, supervision, and training related thereto.  He is being sued in his individual capacity.

8.      Defendant JAIL COMMANDER ANTHONY PAONESSA, at all times mentioned herein, was employed by the COUNTY's Sheriff's Office as Jail Commander, in charge of the Main Jail, and was acting within the course and scope of that employment.  At all relevant times, on information and belief, Defendant PAONESSA was a policy making official for the Main Jail, with authority delegated to him by the Sheriff, and responsible for all policies, procedures, customs, hiring, staffing, supervision, and training at the jail.  MR. GALLEY was housed at the Main Jail during the pertinent events discussed below.

9.      Defendant VEER BABU, M.D., at all times mentioned herein, was employed by Defendant COUNTY's Department of Health Services as Chief Medical Officer and Medical Director.  On information and belief, Defendant BABU was the Medical Director overseeing medical and mental healthcare services and at Sacramento County jails, through the Adult Correctional Health ("ACH") division of the COUNTY's Department of Health Services.  On information and belief, Defendant BABU was a policy making official for the Main Jail and COUNTY, with authority delegated to him by the Sheriff, and responsible for all medical-related policies, procedures, customs, hiring, staffing, supervision, and training at the jail, including but not limited to those related to detoxification protocols and medical screening upon intake.

10.     Defendants MAXIM HEALTHCARE SERVICES, INC. dba MAXIM STAFFING SOLUTIONS, "including its affiliates and subsidiaries" per its contracts with the COUNTY, and MAXIM HEALTHCARE STAFFING SERVICES, INC. (hereinafter collectively referred to as "MAXIM") were at all times herein mentioned alter-egos of each other, sharing money, resources, policies, practices, officers, directors, attorneys, and management, and were each Maryland corporations licensed to do business in California, with their corporate headquarters located in Columbia, Maryland.  On information and belief, Defendants MAXIM HEALTHCARE SERVICES, INC. dba MAXIM STAFFING SOLUTIONS and MAXIM HEALTHCARE

STAFFING SERVICES, INC. were all directly responsible for staffing, training, supervision, and certain policies and customs COUNTY'S jail, at all material times.  On information and belief, Defendant MAXIM at all material times provided licensed, qualified physicians and nurses on a contract basis to Sacramento County jails, including the Main Jail, and employed or was responsible for Defendant ERICA WOODS, R.N., and one or more DOE Defendants.  Under common law, Defendant MAXIM is vicariously liable for the acts and omissions of its employees, including Defendant WOODS, within the course and scope of that employment.

11.     Defendant ERICA WOODS, R.N., at all times mentioned herein, was employed by Defendant MAXIM as a Registered Nurse, and was acting within the course and scope of that employment while working at the COUNTY Main Jail, with the COUNTY's right to investigate, approve and/or reject her placement at its jail, pursuant to one or more contracts between MAXIM and COUNTY.  Defendant WOODS also was subject to, and required to obey, all COUNTY policies, procedures, and customs at the jail, and was subject to training, direction, and supervision by COUNTY and its employees, including Defendants JONES, PAONESSA, and BABU. Defendant WOODS performed the intake medical assessment for MR. GALLEY when he was booked into jail, and with deliberate indifference to MR. GALLEY'S rights and medical needs failed to follow appropriate protocols for assessing, monitoring, and treating MR. GALLEY for alcohol detoxification and withdrawal, and for ensuring follow-up for MR. GALLEY, who should have been placed on alcohol withdrawal protocols.

12.     All COUNTY and MAXIM medical and mental health staff were responsible for properly assessing and classifying inmates, properly assessing and addressing the medical needs of inmates, properly assessing and addressing the mental health needs of inmates, properly assessing and treating the serious medical needs of inmates, providing appropriate observation and a treatment plan for serious medical needs, including alcohol detoxification and withdrawal protocols, monitoring inmates, and summoning medical care when it was needed.

13.     Defendants DOES 1-20 ("DOE Defendants"), at all times mentioned herein, were employed by MAXIM Defendants as health care personnel and/or by Defendant COUNTY as

correctional deputies, sergeants, supervisors, health care personnel, mental health care personnel, or other policy making officials at the jail, and were acting within the course and scope of that employment.  DOE Defendants are being sued in their individual capacities.

14.     Plaintiffs are ignorant of the true names and capacities of Defendants DOES 1-20 (DOE Defendants") and therefore sue these Defendants by such fictitious names.  Despite Plaintiffs' multiple and lawful requests for MR. GALLEY's jail custody records, including observation logs, incident reports, and other pertinent records, Defendant COUNTY has refused to produce them without a subpoena.  Plaintiffs are informed and believe and thereon allege that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein.  Plaintiffs will amend their complaint to state the names and capacities of each DOE DEFENDANT when they have been ascertained.

15.     Plaintiffs are informed and believe and thereon allege that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiffs are further informed and believe and thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged.  At all material times, each Defendant was jointly engaged in tortious activity, fundamentally involved, and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiffs' and Decedent's constitutional rights and other harm.

16.     The acts and omissions of the Defendants as set forth herein, were at all material times pursuant to the actual customs, policies, practices and procedures of Defendant COUNTY, approved and/or tolerated by Defendants JONES, PAONESSA, and BABU.

17.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California and COUNTY.

18.     Plaintiffs timely and properly filed a tort claim with COUNTY pursuant to California Government Code sections 910 et seq., and this action is timely filed within all applicable statutes of limitation.

19.     This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

### GENERAL ALLEGATIONS

20.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

21.     ANTHONY GALLEY was a 37-year-old father of two children, P.P and B.P, whom he loved very much.  When not incarcerated, MR. GALLEY saw his children every day and maintained a positive relationship with them and with their mother (his ex-wife), CHRISTINA O'NEIL.  **Exhibit A** contains a sample of family photos.

22.     On or about February 13, 2022, MR. GALLEY was arrested in the county of Sacramento and brought to Sacramento County Jail.  On information and belief, MR. GALLEY was arrested for an alleged possible hit and run stemming from an altercation at a Super Bowl party earlier that evening.  MR. GALLEY was at the party with family and friends.  Afterwards, on information and belief, an altercation occurred in which one or more guests at the party wanted to fight MR. GALLEY, possibly including an extended family member with whom MR. GALLEY otherwise had a close relationship.  As MR. GALLEY attempted to leave in his car, an individual clung to one of the side door mirrors while the car was moving, then fell, at which point his leg was allegedly injured.  On information and belief, police nearby witnessed the incident and arrested MR. GALLEY, who had already pulled over to the side of the road before police intervened.

23.     Following his arrest, MR. GALLEY was brought to Sacramento County Jail some time around the late evening on or about February 13, 2022.  Upon intake, based on jail intake/medical records, MR. GALLEY was medically screened by Defendant ERICA WOODS, RN.  MR. GALLEY informed Defendant WOODS of the following:

- He had used alcohol within the last 14 days, and within the last 24 hours;

- He had a history of alcohol use;
- He had used hard alcohol on more than 20 days within the last 30 days, and had used hard alcohol for the last 2 years;
- He had last used hard alcohol earlier that day (2/13/22);
- He had a habit of drinking 1 gallon of hard alcohol daily for the last two years; and
- He had a history of alcohol withdrawal.

Further, on information and belief, MR. GALLEY was noticeably alcohol impaired at that time. MR. GALLEY suffered from a longstanding alcohol use disorder, and was physically dependent on alcohol.

24.    MR. GALLEY had a longstanding history of alcohol, heroin, and benzodiazepine addiction – although on information and belief, MR. GALLEY was not using heroin or benzodiazepines at the time of his arrest on February 13, 2022.  MR. GALLEY understood the implications of his alcohol dependence and the importance of informing jail medical staff of it.  On information and belief, due his alcohol dependence, MR. GALLEY would take shots of vodka in four-hour intervals, including while at work, to ensure that he would not experience alcohol withdrawal symptoms.  MR. GALLEY had a history of being detained in Sacramento County Jail many times and had repeatedly informed the jail healthcare staff of his alcohol and drug dependence and his history of serious withdrawal symptoms, including that he would have seizures if he stopped using alcohol.  During several previous jail detentions, MR. GALLEY was placed on necessary detoxification and withdrawal protocols.  This information is documented in MR. GALLEY's jail medical records, which were accessible to Defendant WOODS and DOES 1-20 when Mr. Galley was brought into jail on or around February 13, 2022, and Defendant WOODS had a medical and legal duty to read those records.

25.    Given the information provided by MR. GALLEY about his alcohol usage and withdrawal, as well as MR. GALLEY's long and documented history of withdrawal within the Sacramento County Jail, Defendant WOODS was required to put him on immediate detoxification and alcohol withdrawal protocols, which would have included repeated monitoring, assessments for withdrawal symptoms (every 8 hours, at minimum), vitamins such as thiamine, folic acid, and

multivitamins, and medications such as diazepam to prevent serious alcohol withdrawal.  Defendant WOODS failed to put MR. GALLEY on any alcohol detoxification protocols at all.  Consistent with nationally recognized clinical standards and, on information and belief, SCSO policy, any competent Registered Nurse would have understood that, MR.  GALLEY was required to be put on alcohol detoxification protocols like CIWA (Clinical Institute Withdrawal Assessment).  Continued monitoring, medications, fluids, and assessments concerning alcohol withdrawal were required for MR. GALLEY, particularly given his reported alcohol use and known history of withdrawal. Severe alcohol withdrawal is easily preventable with appropriate detoxification care.  It is well known in the medical and nursing communities that untreated alcohol withdrawal can lead to Delirium Tremens (severe alcohol withdrawal), seizures and death.  Defendant MAXIM is vicariously liable for the actions and omissions of Defendant WOODS under the doctrine of repondeat superior.

26.      On information and belief, DOES 1-20 also failed to provide MR. GALLEY with necessary and required direct visual observation and/or refused requests for medical care, including appropriate detoxification and withdrawal measures.

27.      Since Defendant WOODS and DOES 1-20 failed to place MR. GALLEY on any alcohol detoxification protocols and provide him with the necessary care he required, he was never further monitored or assessed for signs of alcohol withdrawal while he awaited to be booked into jail.  On information and belief, MR. GALLEY asked to be seen by jail medical staff, but was told he had already been seen at intake and would be seen again after he was processed through the and placed in an upstairs jail housing unit. In the early morning hours of February 15, 2022, two days after he was brought in for booking, MR. GALLEY had a seizure while lying on a table in the jail's Own Recognizance (OR) tank, where he and other inmates had been brought for their classification interviews.  On information and belief, upon witnessing MR. GALLEY's seizure, other inmates in the cell tried to get the attention of the jail staff, telling them that something was seriously wrong with MR. GALLEY.  On information and belief, jail staff ignored their pleas for help, until several inmates finally began banging on the OR tank windows and screaming for help.  At that point,

multiple deputies responded to the OR tank.  On information and belief, as many as 30 minutes elapsed between the commencing of MR. GALLEY's seizure and arrival of responding deputies.

28.     Minutes after several deputies responded to the OR tank, two nurses arrived there, and the tank was cleared of inmates so the nurses could enter.  The nurses took MR. GALLEY's vital signs and administered Narcan, with no response.  Deputies took turns performing CPR on MR. GALLEY, and eventually utilized an Automated External Defibrillator (AED) on MR. GALLEY, with no response.  Roughly 10 minutes after deputies responded to the OR tank, the Sacramento Fire Department arrived on the scene, continued administering aid, and brought MR. GALLEY to Sutter Medical Center, where he was pronounced dead in the emergency department.

29.     Sacramento Fire Department records indicate that jail staff were unable to provide a time that MR. GALLEY was last seen prior to suffering a seizure caused by severe alcohol withdrawal – significant evidence that currently unknown jail staff were not performing their required cell checks.  On information and belief, MR. GALLEY began experiencing symptoms of alcohol withdrawal within hours of his jail admission, which jail and medical staff and/or ignored. Because Defendants WOODS and DOES 1-20 failed to place MR. GALLEY on necessary and life-saving alcohol withdrawal protocols, MR. GALLEY received no follow-up assessments or care. On further information and belief, DOES 1-20 failed to properly conduct and document timely direct visual observations of MR. GALLEY for his safety and welfare as required by law.

30.     Sacramento County has actively concealed facts concerning MR. GALLEY's death from Plaintiffs.  The Sacramento County Sheriff's Office ("SCSO") has refused multiple lawful requests for records related to this incident made by Plaintiffs – MR. GALLEY's two children, who are his legal successors in interest – prior to litigation.  The SCSO has refused to provide any jail custody records without a subpoena (which is impossible for Plaintiffs to serve without filing a lawsuit), despite attempts by Plaintiffs to obtain such records through a Public Records Act request and by submitting a separate request as MR. GALLEY's successors in interest, with documentation and sworn declarations affirming that status.  All that Plaintiffs have been able to obtain are MR. GALLEY's jail medical records and a portion of a "casualty report" – for which Plaintiffs were

1   originally told they would need a subpoena – documenting the response to MR. GALLEY's seizure.

2   The report makes reference to surveillance footage documenting the incident and MR. GALLEY's

3   whereabouts prior to the incident, which Defendants have refused to provide to Plaintiffs.

4   Additionally, the Sacramento County Coroner's Office has repeatedly refused to release MR.

5   GALLEY's autopsy photos to Plaintiffs, despite Plaintiffs' lawful and complete requests for the

6   photos, on grounds that they will not release such records without a subpoena – in direct

7   contradiction to Cal. Civ. Code § 129(a)(3)(A), which unequivocally allows a decedent's

8   successor(s)-in-interest to obtain autopsy photos without a subpoena.

9       31.    All Defendants, including currently unidentified deputies, jail administrators, jail

10  medical and health personnel, mental health personnel, and/or law enforcement officers (DOES),

11  knew or had reason to know that MR. GALLEY was suffering from serious medical needs, and was

12  at a high risk for severe and life-threatening alcohol withdrawal, and/or was experiencing alcohol

13  withdrawal symptoms, and all Defendants were deliberately indifferent to those serious medical

14  needs and risks, and denied MR. GALLEY of the care and monitoring he needed.  Due to such

15  deliberate indifference, MR. GALLEY experienced alcohol withdrawal symptoms, likely within

16  hours of his jail admission, which progressed to untreated and completely preventable severe, life-

17  threatening alcohol withdrawal, ultimately causing his seizure and death.

18      32.    MR. GALLEY's death was proximately caused by each Defendant's deliberate

19  indifference to his serious medical needs, as set forth above.

20      33.    MR. GALLEY's death was also proximately caused by Defendant COUNTY's. and

21  Jail managers Sheriff SCOTT R. JONES's ("JONES"), Commander ANTHONY PAONESSA's,

22  and Medical Director VEER BABU, M.D.'s failure to reasonably staff, train, and supervise jail

23  deputies and health care personnel tasked with screening, admitting, observing, monitoring, and

24  protecting inmates and detainees like MR. GALLEY.  These substantial failures reflect Defendant

25  COUNTY's policies implicitly or directly, ratifying and/or authorizing the deliberate indifference to

26  serious medical needs, and the failure to reasonably hire, train, instruct, monitor, supervise,

27

28

investigate, and discipline deputy sheriffs and health care personnel employed by Defendants COUNTY, with deliberate indifference to inmates' and detainees' serious medical needs.

34.     At all material times, and alternatively, the actions and omissions of each Defendant were intentional, wanton and/or willful, conscience-shocking, reckless, malicious, deliberately indifferent to Decedent's and Plaintiffs' rights, done with actual malice, grossly negligent, negligent, and objectively unreasonable.

35.     As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, to the extent permitted and pled by the various legal claims set forth below, Plaintiffs sustained the following injuries and damages, past and future, among others:

- Wrongful death of ANTHONY GALLEY, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

- Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

- Plaintiffs' emotional distress and loss of familial relations [individual familial association claims];

- Violation of ANTHONY GALLEY's constitutional rights, pursuant to Cal. Code of Civ. Proc. § 377.20 et. seq. and federal civil rights law;

- ANTHONY GALLEY's loss of life, pursuant to federal civil rights law;

- ANTHONY GALLEY's conscious pain and suffering, pursuant to federal civil rights law;

- All damages, penalties, treble damages, attorneys' fees, and costs recoverable under 42 U.S.C. §§ 1983 and 1988, 42 U.S.C. § 12132 and 28 C.F.R. §35, et seq., 29 U.S.C. § 794, et seq.; Cal Civil Code §§ 52 and 52.1 *et seq.*, Cal. Code of Civil Procedure § 1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**PLAINTIFFS AGAINST DEFENDANTS WOODS and DOES 1-20**

36.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

37.     By the actions and omissions described above, Defendants Nurse WOODS, and DOES 1-20, acting under the color of state law in their individual capacities, were deliberately indifferent to the obvious serious medical needs of MR. GALLEY, and thus deprived MR. GALLEY as a pretrial detainee of the rights, privileges, and immunities secured by the Fourteenth Amendment by subjecting him, or through their deliberate indifference allowing others to subject him, to delay and denial of necessary medical care for a serious, but treatable, medical condition.

38.     Defendants knew that MR. GALLEY's medical condition was serious, presented risk of death, and was easily treatable.   Defendants nonetheless ignored, delayed, or denied MR. GALLEY's urgently needed medical treatment and monitoring, which they had a duty to provide. As a result of the Defendants' deliberate indifference to MR. GALLEY's serious medical needs, Plaintiffs suffered damages and deprivation of constitutional rights, as described herein.

39.     By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiffs and Decedent of the following well-settled constitutional rights that are protected by the First and Fourteenth Amendments to the U.S. Constitution:

- The right to be free from deliberate indifference to MR. GALLEY's serious medical needs while in custody and confined in jail as a pretrial detainee, as secured by the Fourteenth Amendment;

- The right to be free from wrongful government interference with familial relationships and Plaintiffs' rights to companionship, society, and support from their father, as secured by the First and Fourteenth Amendments.

40.     Defendants WOODS and Does 1-20 also failed to intervene, prevent, or stop the constitutional violations of ANTHONY GALLEY's rights by others, when Defendants were in a position to so intervene while such violations were occurring.

41.     Defendants subjected Plaintiffs to their wrongful conduct, depriving Plaintiffs and

Decedent of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs (Individually and on behalf of ANTHONY GALLEY) and others would be violated by their acts and/or omissions.

42.     As a proximate result of the foregoing wrongful acts and/or omissions, Plaintiffs sustained injuries and damages, as set forth above, in ¶ 35.  Plaintiffs are therefore entitled to general and compensatory damages in an amount to be proven at trial.

43.     In committing the acts alleged above, the individually named Defendants and DOES 1-20 acted maliciously, oppressively, and/or engaged in reckless disregard for the rights and safety of Plaintiffs and Decedent, and by reason thereof, Plaintiffs are entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983, California Code of Civil Procedure §§ 377.20 et seq, and other state and federal law against these individual Defendants; no punitive damages are sought directly against Defendant COUNTY.

44.     Plaintiffs are also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988 and other applicable California codes and laws.

**SECOND CAUSE OF ACTION**
**(*Monell* and Supervisory Liability- 42 U.S.C. § 1983)**
**PLAINTIFFS AGAINST DEFENDANTS COUNTY, JONES, PAONESSA, BABU**
**and DOES 1-20**

45.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

46.     Defendants Sheriff JONES, Commander PAONESSA, Medical Director BABU, and DOES 1-20 were each responsible for overall provision of all custody and medical services at the Sacramento County Main Jail, including staffing, as well as hiring, training and supervision of staff, subject to Constitutional duties and restrictions, court-ordered and agreed duties and restrictions, and other legal duties, mandates, and restrictions.  All wrongful conduct by Defendants JONES, PAONESSA, and BABU alleged herein was ministerial and not discretionary as defined by Cal. Gov. Code § 820.2 and similar state law provisions.

47.     On October 26, 2022, the *Sacramento Bee* published an article, "Sacramento jail failing in health care for inmates, with report citing 'filthy' areas."  That article described, "a chronic shortage of nurses and doctors and an overcrowding problem so severe that the Main Jail has twice as many inmates as it was originally designed to hold."  The report referenced in the article is a Monitoring Report published on October 25, 2022, and filed in *Mays v. Sacramento County*, 2:18-cv-02081-TLN-KJN (E.D. Cal.).  (*See* Third Monitoring Report of the Medical Consent Decree, ECF Dkt. No. 162-1).[1]  **The Third Monitoring Report specifically addresses MR. GALLEY's wrongful death, concluding with following opinion:**

> This patient gave a history of severe alcohol substance abuse upon arrival with detox symptoms. The patient remained in booking, but neither CIWA assessments or health checks were documented as being performed per policy. Inmates reported that the patient had a seizure prior to arresting. *This case represents a profound failure to recognize, monitor and treat a patient at risk of severe alcohol withdrawal. The patient was not evaluated by a medical provider in accordance with policy.*

(Third Monitoring Report, ECF Dkt. No. 162-1, p. 76) (emphasis in original).[2]  The report details a similar incident, also in February of 2022, in which jail medical staff failed to order follow-up detox monitoring for another detainee with a history of substance use disorder who reported use of heroin and methamphetamine within the previous 24 hours.  Four days later, that detainee experienced withdrawal symptoms of nausea, vomiting, diarrhea, body aches, and cold sweats before jail medical staff finally initiated opioid detox protocols.  (*Id.* at 75).  Even then, contrary to written policy, the detainee was not monitored timely once noted to be in withdrawal.  (*Id.*).  Regarding that incident, the report further notes: "It is shocking that four of seven patients in the women's holding

---

[1] *Mays* was a class action lawsuit filed against Sacramento County in 2018, alleging dangerous and unconstitutional conditions in Sacramento County jails.  On January 8, 2020, the court approved a settlement adopting a Consent Decree requiring Sacramento County to implement a broad Remedial Plan and accompanying policies pursuant to a schedule set forth within the decree.  (See Order Granting Settlement, ECF Dkt. No. 110; See Consent Decree, ECF Dkt. No. 85-1).  The Consent Decree further provides that Court Experts shall advise the Court on Defendant's compliance with the Remedial Plan every 180 days for the duration of the decree's term.  (See Consent Decree, ECF Dkt. No. 85-1, pg. 99).  To date, three monitoring reports concerning the medical consent decree have been filed in the court record.  (See ECF Dkt. Nos. 136-1, 149-1, and 162-1).

[2] The Third Monitoring Report does not identify MR. GALLEY by name, but as "Patient #10."

tank were in active withdrawal and no action was taken by custody or health care staff to intervene. **It raises serious questions about custody and health care training and supervision.**" (*Id.* at 76) (emphasis added).  The report further concludes that "[s]ignificant and timely effort needs to be made to bring health care in the Sacramento County Jails to minimally adequate levels[,]" and "th[e] system urgently needs more active oversight and leadership." (*Id.* at 13).  Notably, "[w]ith respect to quality reviews, aside from mortality reviews, no documentation was provided to demonstrate that the Medical Director performs systematic reviews to evaluate the quality of medical care provided to the population." (*Id.* at 16).

48.     The Court Experts' Third Monitoring Report documented their evaluation of the Main Jail's Detoxification Protocols for compliance with the following Consent Decree requirements:

> 1.1     Within three months of the date the Remedial plan is issued by the Court, the County shall develop and implement protocols for assessment, treatment, and medication interventions for alcohol, opiate and benzodiazepine withdrawal that are consistent with community standards; and
>
> 1.2     The protocols shall include the requirements that:
>
> > i.    nursing assessments of people experiencing detoxification shall be done at least twice a day for five days and reviewed by a physician;
> >
> > ii.   nursing assessments shall include both physical findings, including a full set of vital signs, as well as psychiatric findings;
> >
> > iii.  medication interventions shall be updated to treat withdrawal syndromes to provide evidenced-based medication in sufficient doses to be efficacious;
> >
> > iv.   the County shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy; and
> >
> > v.    patients experiencing severe-life threatening intoxication (an overdose), or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available.

(Third Monitoring Report, ECF Dkt. No. 162-1, p. 74; Consent Decree, ECF Dkt. No. 85-1, p. 56). **The Court Experts concluded that the COUNTY was noncompliant with those requirements.** (*Id.* at 77).  Instead, the Court Experts found that "patients with substance use disorders did not receive adequate evaluation, treatment and monitoring, resulting in preventable suffering and

death," and noted the following "key" findings which represent the COUNTY's customs and actual jail policies:

2.1 Intake nurses do not consistently take adequate substance abuse histories, obtain urine drug screens, accurately assess the risk of withdrawal and order treatment and monitoring;

2.2 Medical providers do not see patients with substance use disorder within 24 hours and do not provide any medical supervision of patients withdrawing from alcohol, benzodiazepines or opioids;

2.3 Nurses do not timely monitor patients for withdrawal symptoms, sometimes performing CIWA and COWS assessments only at intake, or for one day thereafter, and

2.4 Population pressures limiting bedspace management, COVID-19 quarantine requirements, and lack of a dedicated detox unit results in patients languishing in booking cells for up to three days during which time withdrawal symptoms intensify.

(Id. at. 74). Based on those findings and the COUNTY's failure to comply with the Remedial Plan per the Consent Decree, the Court Experts made the following recommendations, (necessary for the County and its jail managers to begin providing constitutionally adequate jail conditions and medical care):

3.1 The County needs to implement fixed dose treatment regimens (as opposed to symptom triggered treatment) to prevent escalation of withdrawal syndromes;

3.2 The County needs to provide additional training and real-time feedback to intake nurses regarding substance use disorder histories, including withdrawal symptoms;

3.3 A medical provider needs to evaluate all patients with substance abuse withdrawal in 24 hours in accordance with policy and procedure;

3.4 The Medical Director needs to ensure increased medical supervision of patients undergoing substance use disorder monitoring and treatment;

3.5 The County needs to establish a detox unit to permit timely monitoring and treatment of patients at risk of withdrawal, however we are aware [of] the Nacht and Lewis report's findings that space is inadequate at the Main Jail to establish such a unit; and

3.6 The County should implement more comprehensive CQI studies of performance to track compliance with policies and procedures.

(Id. at 77).

49.     On March 1, 2022, two weeks after MR. GALLEY's death, class counsel in *Mays* sent an urgent letter to COUNTY and SCSO officials concerning detoxification health care and booking loop conditions.  (See ECF Dkt. 153-4.)  The letter addressed MR. GALLEY's death along with examples of "dangerous and degrading conditions of confinement" in the Main Jail, similar to those later addressed in the Third Monitoring Report.  (*Id*. at 2).  Excerpts from that letter include:

- As class counsel in *Mays v. Sacramento*, we recently became aware that due to ongoing jail overcrowding, the Sacramento Sheriff's Office (SSO) has been unable to move people from the booking loop to the housing units in a timely manner.  The return to pre-pandemic population levels, even as pandemic-related quarantine safety protocols persist and strain the Main Jail's facility management, has led to a horrifying and dangerous situation for *Mays* class members.  Rather than being processed expeditiously following arrival at the jail, dozens of people are spending several days at a time sleeping on concrete floors in filthy, below-ground holding cells that are not intended for human habitation. **While there, they are denied basic medical and mental health care, even while experiencing serious mental health needs or active withdrawal from substance use. Just two weeks ago, a man with alcohol substance use disorder died on his third day in the booking loop**;

- People in the jail are being held in windowless, basement holding cells for multiple days after they arrive at the jail. The holding cells are freezing cold and filthy, with used toilet paper, old utensils, and used undergarments crumpled on the floor;

- People report that the holding cells reek of feces and vomit. **Many of the people in the holding cells are experiencing withdrawal from alcohol and other substances. They report that they vomited and defecated repeatedly for days as their bodies suffered through withdrawal. One woman reported that so many people in the holding cell were vomiting that they had to use cups to hold their vomit until the toilet was available.** The toilets have flushing restrictions, so feces and vomit pile up in the toilet. No one is permitted to shower while held in the booking loop holding cells;

- There are no books, no television, no radio, and no writing materials available to people in the booking loop holding cells. Many people report that they simply stared at the concrete floor and walls for hours waiting for the time to pass. Several people reported that deputies failed to provide some meals while they were in the booking loop. **People told us that they were treated "like animals" when they asked the deputies passing by how long they would remain in the holding cells or how they could access the health care services they needed**;

- The stakes of these failures are profound. **A man in his late thirties died earlier this month in the Main Jail booking loop. While the official cause of death has yet to be determined, medical records indicate that he reported a**

**significant ongoing alcohol substance use disorder at the time of intake. Despite knowledge of this condition, no health care staff member documented any assessment of the patient for days. He remained in the booking loop without any documented medical attention until he died two days later in a holding cell, under circumstances consistent with untreated alcohol withdrawal**;

- Even before the recent overcrowding-driven reliance on the booking loop for housing, the court-appointed medical experts in this case reported that the County is failing to adequately monitor or treat people going through substance use withdrawal; and

- **It is difficult to imagine a more dangerous situation.** Staffing deficits and population challenges do not justify the failure to provide basic, life-saving care to people who are in an exceptionally high-risk state.

(*Id.* at 2-4) (emphases added).

50.     The Second Monitoring Report, published October 4, 2021 – four months *before* MR. GALLEY's death – evaluated Detoxification Protocols at the Main Jail for compliance with the same requirements described above in ¶ 47(1.1)-(1.2).  (See Second Monitoring Report, ECF Dkt. No. 149-1, pg. 52-53).  As with the Third Monitoring Report, the Court Experts concluded that COUNTY was noncompliant with those requirements.  (*Id.* at 55).  The Second Monitoring Report further describes similar deficiencies in Detoxification Protocols at the Main Jail, including that:

    1.1.     Nurses did not take complete substance use disorder histories;

    1.2.     Nurses did not timely monitor patients for alcohol withdrawal, delaying treatment for patients in withdrawal;

    1.3.     Nurses discontinue withdrawal monitoring after a number of CIWA assessments that is not compliant with the current standardized procedure, which is a concern for patients at risk of alcohol and benzodiazepine withdrawal who may not manifest withdrawal symptoms for 24 hours or more; and

    1.4.     There is no detox unit for nurses to efficiently and effectively monitor patients and conduct assessments.

(*Id.* at 53).  Based on those findings and the COUNTY's failure to comply with the requirements set forth in the Remedial Plan, the experts offered the following recommendations:

    2.1.     The County needs to revise its substance use disorder treatment policies and standardized nursing protocols to be fully compliant with Consent Decree requirements and internally consistent;

2.2.　County needs to provide additional training and real-time feedback to intake nurses regarding substance use disorder histories, including withdrawal symptoms;

2.3.　Centricity should be reconfigured to create substance use disorder order sets that the intake nurse would order when substance abuse monitoring and treatment is indicated, instead of a generic Priority Flex Nurse (PFN) appointment that does not create an order for nurses to perform CIWA and COWS assessments within 6 hours;

2.4.　Establish a detox unit, with adequate, clean treatment/observation space, to permit timely monitoring and treatment of patients at risk of withdrawal;

2.5.　Consider implementing fixed dose treatment regimens (as opposed to symptom triggered treatment) to prevent escalation of withdrawal syndromes;

2.6.　The Medical Director needs to ensure increased medical supervision of patients undergoing substance use disorder monitoring and treatment;

2.7.　The County should develop a tracking system to ensure that all patients being monitored for substance use withdrawal receive timely assessments; and

2.8.　The County should implement CQI studies of performance to track compliance with policies and procedures.

(*Id.* at 55).  The Second Monitoring Report further provided details of specific incidents where delayed monitoring and treatment caused preventable suffering, including the following:

3.1.　On 4/9/21, a man with a medical history that included alcohol and opiate use disorder arrived the Main Jail, and at intake reported daily heroin use, consumption of a 12-pack of beer daily, and valium daily for 20 years, and that he had withdrawal symptoms upon cessation.  The nurse did not order a detox regimen for alcohol, benzodiazepines, or heroin, and did not perform a CIWA or COWS (Clinical Opiate Withdrawal Scale) assessment for 24 hours, at which time the patient reported severe and constant pain from body aches.  The nurse then ordered an opiate withdrawal regimen, but the first dose was not given for an additional 20 hours, and nurses failed to conduct follow-up CIWA or COWS screenings as required by standardized nursing procedures;

3.2.　On 3/10/21, a man with a history of alcohol and heroin substance use disorder arrived at the Main Jail.  An RN performed his screening, recording COWS and CIWA scores of 0.  No COWS or CIWA assessments were conducted the following day.  On the third day, a COWS assessment produced a score of 13, indicating that the patient was in moderate opiate withdrawal.  A nurse ordered a detox regimen and the patient received the first dose four hours later, but was not monitored again for two days; and

3.3.   On 3/21/21, a woman with a medical history that included heroin use and substance use disorder arrived at the Main Jail.  Nurses did not perform a COWS screening for 48 hours, at which point the woman reported not feeling well with body aches.  The COWS score was 13, and opiate detox protocol was initiated.

(*Id.* at 54).

51.   Finally, the First Monitoring Report, submitted on January 20, 2021, details failures similar to those recorded in the Second and Third Monitoring Reports.  (See ECF Dkt. No. 136-1). The Court Experts compiling the report found that the COUNTY's Standardized Nursing Procedures (SNPs) for alcohol, benzodiazepine, and opiate withdrawal "are not compliant with the remedial plan nor with nationally recognized clinical treatment guidelines," and that "the County is not complying with their own Withdrawal Treatment Standardized Nursing Procedure (SNP) requirements."  (*Id.* at 43).  Specifically, the COUNTY's SNP did not include:

1.1.   Direction to Intake nurses regarding referral of patients with history of severe alcohol withdrawal and/or medical comorbidities (e.g., cirrhosis, gastrointestinal bleeding, other poorly controlled chronic diseases) to a physician for medical evaluation within 24 hours or sooner, as clinically indicated.

1.2.   Adequate frequency of clinical monitoring of patients placed in a sobering cell.

1.3.   Nursing CIWA assessments to be performed a minimum of twice daily for 5 days.

1.4.   Alcohol treatment regimens that are consistent with the risk or severity of alcohol withdrawal and which taper [at a medically necessary rate.]

1.5.   Immediate notification of physicians for any patient in moderate to severe alcohol withdrawal.

1.6.   Placement in medically supervised housing for pregnant and non-pregnant women with a history of severe alcohol withdrawal.

1.7.   Requirement to notify a medical provider of patients whose symptoms are escalating on treatment.

(*Id.* at 44).  The experts further reviewed health records of detainees admitted to the Main Jail from March to November of 2020, and found that "patients at risk of alcohol, benzodiazepine and opiate withdrawal are not adequately evaluated during the nurse intake screening and are not monitored in

accordance with the Remedial Plan, ACH Standardized Nursing Procedures, or nationally recognized clinical practice guidelines." (Id. at 46). The report included the following specific cases exemplifying the failure to properly assess, monitor, and care for inmates at risk of substance use withdrawal:

> 2.1 In September of 2020, a man with a history substance use disorder with alcohol, benzodiazepines, heroin, and methamphetamine – and who reported that history during a previous jail admission in 2019 – "was not timely evaluated, monitored, or treated for heroin and possibly other substance use withdrawal that resulted in a likely preventable hospitalization;" and

> 2.2 In July of 2020, an RN failed to collect information upon intake about amount, frequency, duration, or last use for a detainee who reported heroin and benzodiazepine use. The RN conducted an initial COWS assessment, resulting in a score of 3, but did not perform another assessment for the remainder of the day or the following day. More than two days after the patient's arrival, a nurse practitioner assessing the detainee for an unrelated issue noted the patient appeared to be detoxing with an elevated blood pressure and pulse, but did not perform a COWS assessment, order a urine drug screen, address or order monitoring for the detainee's abnormal vital signs, or order opiate and/or benzodiazepine withdrawal medications. Roughly 60 hours after the patient's arrival, an RN performed COWS assessment on the patient – who complained of hot/cold flashes, nausea, vomiting, and diarrhea – resulting in a score of 9, but the RN wrote that the score did not warrant medication, and encouraged the patient to hydrate. No further COWS or CIWA tests were performed. After nine days, the patient began exhibiting paranoia and irrational behavior, and was irritable, disruptive, and not able to follow directions. Eleven days after arriving at the jail , the patient died.

(Id. at 47-48). With regard to the second case example described above, the report noted:

> This case exemplifies the **structural and systemic process issues** described in this report, such as failure to take an adequate substance abuse history, failure to monitor and initiate treatment and lack of medically supervised withdrawal. This case demonstrates lack of cooperation between medical and mental health staff and indifference by two nursing staff to this patient with serious medical needs. **This may reflect a wider cultural issue at the jail in how health care personnel view their obligations to provide timely, appropriate and compassionate care to patients.**

(Id. at 48) (emphasis added). The Court Experts included the following recommendations in their report:

3.1   The County needs to develop a Medically Supervised Withdrawal and Treatment policy and procedure that is consistent with NCCHC (National Commission on Correctional Health Care) standards;

3.2   The County needs to implement nationally recognized clinical practice guidelines regarding substance abuse withdrawal, incorporating the guidelines into expected physician practice standards at Sacramento County Jail;

3.3   The County's medical leadership should ensure increased medical supervision of patients undergoing substance use disorder monitoring and treatment;

3.4   Consider implementing fixed dose treatment regimens (as opposed to symptom triggered treatment) to prevent escalation of withdrawal syndromes;

3.5   The County needs to revise its Substance Abuse Disorder Standardized Nursing Procedures to be consistent with the Remedial Plan and nationally recognized clinical practice guidelines;

3.6   Centricity should be reconfigured to create order sets and alerts for physician referral timeliness, frequency of monitoring, medication regimens, physician review of CIWA/COWS assessments based upon the risk of, or symptoms of SUD withdrawal;

3.7   The Intake Nurse should enter orders for SUD withdrawal monitoring and treatment that creates an alert for nurses to complete COWS or CIWA assessments no later than 6 hours after arrival;

3.8   The County should develop a tracking system to ensure that all patients being monitored for substance use withdrawal receive timely assessments;

3.9   To the extent feasible, designate housing units for the purposes of detox monitoring;

3.10  Provide training to health care staff regarding revised policies, standardized nursing procedures and clinical practice guidelines; and

3.11  The County should implement CQI studies of performance to track compliance with policies and procedures.

(*Id.* at 49). As with the Second and Third Monitoring Reports, the Court Experts found that the COUNTY was noncompliant with the requirements concerning Detoxification Protocols set out in the Consent Decree. (*Id.*).

52.     Read together, the three Jail Experts' reports document the customs, practices, and actual policies at the Sacramento County Main Jail that have led to constitutionally deficient

conditions and medical care for inmates, and that those jail customs and actual policies persisted through the time of MR. GALLEY's jail detention and death.

53.     At all material times, on information and belief, Defendants Sheriff JONES, Commander PAONESSA, Medical Director BABU, and DOES 1-20 knew that jail medical staff were not consistently and properly screening new inmates for alcohol withdrawal, with grave, life-threatening risks to inmates.  Indeed, the *Mays* monitoring reports (described above) alone reflect a consistent failure or refusal at the Main Jail, over the course of nearly two years before and after MR. GALLEY's death, to properly screen and monitor inmates and detainees with substance use disorders and implement medically necessary detoxification protocols – due both to constitutionally deficient policies that failed to track national, clinical standards and to an apparent custom and practice of jail medical staff failing to adhere to the COUNTY's written policies.  On information and belief, Defendants JONES, PAONESSA, BABU, and DOES 1-20 were aware of the findings and conclusions of the *Mays* monitoring reports.  Further, Defendants Sheriff JONES, Commander PAONESSA, Medical Director BABU, and DOES 1-20 knew that the cause of such blatantly inadequate and deliberately indifferent medical screening was due, in part, to severe over-crowding of the jail and inadequate staffing, training, and supervision of medical and custody personnel, over which these Defendants had control.  On information and belief, Defendants Sheriff JONES, Commander PAONESSA, Medical Director BABU, and DOES 1-20 allowed custody and medical staffing shortages at the main jail at the time that jail medical staff failed to properly screen, assess, and treat ANTHONY GALLEY, and such staffing shortages were a cause of the jail's delay and denial of medical care for ANTHONY GALLEY's serious medical needs.  On information and belief, Defendants Sheriff JONES, Commander PAONESSA, Medical Director BABU, and DOES 1-20 knew or should have known of the widespread failures of jail and medical staff to adhere to both national clinical standards concerning alcohol and other drug detoxification protocols and the COUNTY's own written policies concerning alcohol and other drug detoxification protocols, and failed to intervene to deter continued violations of those protocols.

54.     Defendants Sheriff JONES, Commander PAONESSA, Medical Director BABU, and DOES 1-20, as well as other employees or officers employed by or acting on behalf of Defendant COUNTY, each set in motion, permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights and serious medical needs of MR. GALLEY.  Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, OR knew his or her subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent his or her subordinates from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights.  All such conduct was ministerial and not discretionary.  Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' obvious and apparent violations of Decedent's rights.

55.     Plaintiffs allege, upon information and belief, the unconstitutional actions and/or omissions of the individually named Defendants and the personnel acting on behalf of Defendant COUNTY were pursuant to the following customs, policies, practices and/or procedures of COUNTY, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officials for COUNTY and its Sheriff's Office and Health Department, including, but not limited to, Defendants Sheriff JONES, Commander PAONESSA, Medical Director BABU, and DOES 1-20:

a.  To allow and tolerate severe overcrowding of the Main Jail, and chronic and severe under-staffing of custody and medical personnel, including for monitoring and medically screening new inmates, such that the Main Jail chronically failed to provide adequate medical care for inmates' serious medical needs;

b.  To deny inmates at COUNTY's Main Jail access to appropriate, competent, and necessary care for serious medical needs, including as described herein, failing to provide appropriate and competent screening and monitoring for alcohol withdrawal

syndrome;

c.   To fail to institute proper procedures and training to coordinate inmate assessment, placement, monitoring, and care with jail physicians, nurses, and corrections staff despite an obvious need for such;

d.   To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures for screening, handling, housing, and caring for inmates with alcohol and drug dependencies at the Main Jail;

e.   To allow jail employees to chronically fail to institute required treatment plans for patients;

f.   To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (e) above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiffs, Decedent, and the public, and in the face of an obvious need for such policies, procedures, and training programs.

56.   In the alternative, upon information and belief, to the extent Defendants COUNTY may have instituted policies or training addressing some or all the topics listed above, with deliberate indifference to detainees' rights, COUNTY failed to properly oversee, enforce, and/or properly carry out such policies and/or training.

57.   The above-described customs, policies, practices, and/or procedures of the COUNTY were a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in Count 1.

58.   Defendant COUNTY is also liable for the violations of Plaintiffs' and Decedent's rights by their final policy makers, including Defendants Sheriff JONES, Jail Commander PAONESSA, and Medical Director BABU, as described above.  (See, Ninth Circuit Model Civil Jury Instruction 9.6).  All such conduct by Defendants JONES, PAONESSA, and BABU was ministerial and not discretionary as defined by Cal. Gov. Code § 820.2 and similar state law provisions.

59.   On information, no one was disciplined or retrained for the conduct described herein and in the Jail Monitors' Third Report, that resulted in ANTHONY GALLEY's death.  The

unconstitutional actions and/or omissions of the individually named Defendants, DOES 1-20, other Sheriff's Office, Department of Health Services, and other COUNTY personnel, were approved, tolerated, and/or ratified by policy making officers for COUNTY, including, but not limited to, Sheriff JONES, Jail Commander PAONESSA, Medical Director BABU, and DOES 1-20. Plaintiffs are informed and believe, and thereupon allege, the details of this incident have been revealed to the authorized policy makers within COUNTY, and that such policymakers have direct knowledge of the fact that ANTHONY GALLEY was unlawfully denied necessary care for his serious medical needs, due to their and their subordinates' misconduct and violations of Decedents' rights. Notwithstanding this knowledge, the authorized policymakers within COUNTY and its Sheriff's Office have approved of the individually named Defendants' and DOES 1-20's conduct and decisions in this matter to the extent such individuals were under their supervision and oversight, and have made a deliberate, conscious and affirmative choice to endorse and ratify such conduct and decisions, and the basis for them, which resulted in the death of ANTHONY GALLEY. By so doing, the authorized policymakers within COUNTY and its Sheriff's Office have shown affirmative agreement with the conduct of individual Defendants and other employees/agents under their supervision, and have ratified the unconstitutional acts of these individual Defendants, employees, and agents.

60. The aforementioned choices, customs, policies, practices, and procedures; the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and, the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY, JONES, PAONESSA, BABU, and DOES 1-20 were a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in ¶ 39.

61. As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, polices, practices, and/or procedures of Defendants COUNTY, JONES, PAONESSA, BABU, and DOES 1-20, Plaintiffs sustained serious and permanent injuries and damages and are

entitled to damages, penalties, costs, and attorneys' fees, as set forth above, in ¶¶ 42-44 and punitive damages against Defendants JONES, PAONESSA, BABU, and DOES 1-20, in their individual capacities.

### THIRD CAUSE OF ACTION
### (VIOLATION OF CIVIL CODE § 52.1)
### PLAINTIFFS AGAINST DEFENDANTS WOODS, JONES, PAONESSA, BABU, DOES 1-20, COUNTY, and MAXIM

62.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

63.     By their acts, omissions, customs, and policies, DEFENDANTS WOODS, JONES, PAONESSA, BABU, DOES 1-20, COUNTY, and MAXIM by threat, intimidation, and/or coercion, or with reckless disregard for rights, interfered with, attempted to interfere with, and violated Plaintiffs' and MR. GALLEY's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

    a.    Decedent's right to be free from deliberate indifference to his serious medical needs while in custody as a pretrial detainee, as secured by the Fourteenth Amendment to the United States Constitution and the California Constitution, Article 1, Section 7;

    b.    Plaintiffs' right to be free from wrongful government interference with familial relationships and Plaintiffs' and Decedent's right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments.

64.     Defendants' violations of Plaintiffs' and Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[3]   Alternatively,

---

[3] See *Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. County of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); See also, *Cornell v. City and County of San Francisco*, 17 Cal.App.5th 766, 803 n.32 (2017) (approving *M.H., supra.*); *Page v. County of Madera*, No. 1:17-cv-00849-DAD-EPG, 2017 U.S. Dist. LEXIS 199127 at *10-11 (E.D. Cal. Dec. 2, 2017) (same); *Neuroth v. Mendocino Cty.*, No. 15-cv-3226-NJV, 2016 U.S. Dist. LEXIS 11109, at *22 (N.D. Cal. Jan. 28, 2016) (Bane Act claim pled where sheriff implemented policies, practices, and customs that led to inmate's death due to correctional deputies' deliberate indifference to serious medical/psychiatric needs).

separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of Plaintiffs' and Decedent's rights as described above, Defendants violated Decedent's rights by the following conduct constituting threat, intimidation, or coercion:

a. Intentionally and with deliberate indifference, depriving and/or preventing MR. GALLEY from receiving necessary, life-saving medical care and treatment while he was under Defendants' complete custody, care, and protection and unable to secure such care and treatment for himself;

b. Making the conscious choice not to consistently provide the required observation for inmates at high risk of alcohol withdrawal, knowing that some inmates like MR. GALLEY will be deprived of necessary, life-saving care;

c. Instituting and maintaining the COUNTY's customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as MR. GALLEY and Plaintiffs would be deprived of rights;

d. Intentionally and with deliberate indifference, doing and/or permitting subparagraphs (a) – (c) when it was also obvious that in doing so, Decedent was at grave risk of life-threatening alcohol withdrawal and death, and Plaintiffs' rights as Decedent's children also would be violated.

65. To the extent this claim is based on a violation of Decedent's rights, it is asserted as a survival claim. To the extent that the violations of rights were done to Plaintiffs, it is asserted as a wrongful death claim. To the extent the violations were done to both Decedent and Plaintiffs, it is asserted as both survival and wrongful death.

66. The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

67. Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

68. Further, each Defendant violated Plaintiffs' and Decedent's rights with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.

69.     Defendants COUNTY and MAXIM are vicariously liable pursuant to California Government Code §815.2 and common law, respectively.

70.     As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiffs' and Decedent's rights under the United States and California Constitutions and law, Plaintiffs sustained injuries and damages, and against each and every Defendant named in this Complaint, are entitled to relief as set forth above at ¶¶ 42-44, including punitive damages pursuant to California Civil Code § 3294, against all individual Defendants and Maxim, and all damages and other relief allowed by California Civil Code §§ 52 and 52.1 and California law, including but not limited to costs, attorneys' fees, three times actual damages and civil penalties.

## FOURTH CAUSE OF ACTION
### (Negligence)
### <u>PLAINTIFFS AGAINST DEFENDANTS JONES, PAONESSA, BABU, DOES 1-20, and MAXIM</u>

71.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

72.     At all times, Defendants JONES, PAONESSA, BABU, DOES 1-20, and MAXIM owed Plaintiffs and Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.  This claim against Medical Director BABU is based on his conduct as a jail administrator, not for any medical care he personally provided.

73.     At all times, these Defendants owed Plaintiffs and Decedent the duty to act with reasonable care.

74.     These general duties of reasonable care and due care owed to Plaintiffs and Decedent by these Defendants include but are not limited to the following specific obligations:

- To maintain COUNTY policies and practices to provide prompt and appropriate medical care and supervision for Decedent and similarly situated inmates;

- To refrain from unreasonably creating danger or increasing Decedent's risk of harm;

- To ensure that medical and custody staff at the Main Jail is adequate for inmates' needs, as well as competent, properly trained, and supervised;

- To refrain from allowing and/or setting in place the customs, policies, and practices described above that were a cause, and moving force behind, Decedent's death.

- To use, require, train, and enforce generally accepted correctional procedures that are reasonable and appropriate for Decedent's status as an alcohol dependent person with serious medical needs; and

- To refrain from setting in motion the violation of Plaintiffs' and Decedent's rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

75.     Defendants JONES, PAONESSA, BABU, DOES 1-20, and MAXIM, through their acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiffs and Decedent.

76.     Under common law, Defendant MAXIM is vicariously liable for the acts and omissions of its employees, whether or not named in this action, acting within the course and scope of their employment.

77.     As a direct and proximate result of these Defendants' negligence, Plaintiffs and Decedent sustained injuries and damages, and against each and every Defendant named in this cause of action in their individual capacities are entitled to relief as set forth above at ¶¶ 42-44, including punitive damages pursuant to California Civil Code § 3294 against such individual Defendants and Maxim.

### SIXTH CAUSE OF ACTION
#### (Violation of California Government Code § 845.6)
#### PLAINTIFFS AGAINST DEFENDANTS WOODS, DOES 1-20 and COUNTY

78.     Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

79.     Defendant WOODS was a public employee to the extent that she was performing a public function at all materials times, including part of Defendant COUNTY'S constitutional duties owed to Decedent.  Defendants WOODS and Does 1-20 knew or had reason to know that MR. GALLEY was in need of immediate and higher-level medical care, treatment, observation and monitoring, including being placed on appropriate CIWA or alcohol withdrawal protocol, or

1  transferred to a hospital if Defendants were not going to provide him with detoxification and

2  withdrawal care, and each failed to take reasonable action to summon and/or to provide him access

3  to such medical care and treatment.  Each such individual defendant, employed by and acting

4  within the course and scope of his/her employment with Defendant COUNTY, knowing and/or

5  having reason to know this, failed to take reasonable action to summon and/or provide Decedent

6  access to such care and treatment in violation of California Government Code § 845.6.

7       80.     As legal cause of the aforementioned acts of Defendants WOODS and Does 1-20,

8  Plaintiffs were injured as set forth above, and their losses entitle them to all damages allowable

9  under California law.  Plaintiffs are entitled to damages, penalties, costs, and attorney fees under

10  California law as set forth in ¶¶ 42-44 above, and punitive damages pursuant to California Civil

11  Code § 3294.

12       81.     Under common law, Defendant MAXIM is vicariously liable for the acts and

13  omissions of its employees, whether or not named in this action, acting within the course and scope

14  of their employment.  Defendant COUNTY is vicariously liable for the violations of state law and

15  conduct of their officers, deputies, employees, and agents, including individual named defendants,

16  under California Government Code §§ 845.6 and 815.2.

17  **SEVENTH CAUSE OF ACTION**

18  **(Violation of Title II of the Americans with Disabilities Act ("ADA")
and Rehabilitation Act ("RA"))**

19  **PLAINTIFFS AGAINST DEFENDANT COUNTY**

20       82.     Plaintiffs reallege each and every paragraph in this complaint as if full set forth here.

21       83.     Title II of the ADA prohibits discrimination on the basis of disability by public

22  entities, which the Act broadly defines as "any department, agency, special purpose district, or other

23  instrumentality of a State or States or local government[.]"  42 U.S.C. § 12131(1)(B).  Similarly,

24  §504 of the Rehabilitation Act of 1973 proscribes discrimination by "any program or activity[,]" 29

25  U.S.C. § 794(a), defined as "all of the operations of a department, agency, special purpose district,

26  or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b).  Defendant

27  COUNTY is a covered entity for purposes of enforcement of the ADA, 42 U.S.C. §12181(7)(F),

28

and the Rehabilitation Act, 29 U.S.C. § 794, pursuant to the regulations promulgated under each of these laws.  Further, on information and belief, Defendant COUNTY receives federal assistance and funds.  Defendant COUNTY is also within the mandate of the RA that no person with a disability may be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794.  Defendant COUNTY is vicariously liable for the conduct of its employees and agents under the ADA and RA.

84.     The SCSO is a local agency of Defendant COUNTY whose services, programs, and/or activities are covered under and governed by the ADA and RA, and regulations promulgated under each of these laws.

85.     Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem."  42 U.S.C. § 121019(a)(2).

86.     Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

87.     Discrimination under the ADA and RA includes not only, *e.g.*, a denial of benefits and services or discrimination, but also a failure to provide a reasonable accommodation (also known as reasonable modification) for an individual's disability.  The implementing regulations to § 12132 explain that discrimination on the basis of a disability includes instances when a prisoner with a disability is "denied the benefits of, the services, programs, or activities of a public entity" "because [the prison's] facilities are inaccessible to or unusable by individuals with disabilities." 28 C.F.R. § 35.152(b)(1).

88.     Defendant COUNTY is further mandated under the ADA not to utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability. 42 U.S.C. § 12182(b)(1)(D)(i).  Discrimination also includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford

such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii).

89.　　For purposes of the ADA and RA, a government is vicariously liable for the knowledge and acts of each of its employees and agents.

90.　　At all material times, as a person with the substance use disorder of alcohol dependence (commonly known as "alcoholism") – a recognized physical and mental impairment under 28 C.F.R. § 35.108(b)(2) – ANTHONY GALLEY was a "qualified individual" with medical impairments that limited and/or substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C. § 12131(2), and under Section 504 of the RA, 29 U.S.C. § 794, 28 C.F.R. 42.450(k). Through its employees and agents, Defendant COUNTY had knowledge of MR. GALLEY's disability, which was described in his medical records and by MR. GALLEY himself during his intake medical screening.

91.　　Based on the information known by Defendant COUNTY about MR. GALLEY's substance use disorder, it was obvious that MR. GALLEY needed accommodation to avoid subjecting him to serious risk of harm and death from alcohol withdrawal. As MR. GALLEY was a "qualified [disabled] individual," Defendant COUNTY was required to make reasonable accommodations for MR. GALLEY's disability and provide access to medical and other appropriate services while he was in custody. MR. GALLEY's status as a qualified disabled person also required Defendant COUNTY not to engage in discrimination based on disparate treatment of, or disparate impact on, disabled persons like MR. GALLEY. And, MR. GALLEY's status as a qualified disabled person also required Defendant COUNTY not to exclude him from participation in, or deny him the benefits of, the COUNTY's and its jail's services, programs, or activities, including medical treatment.

92.　　Defendant County violated MR. GALLEY's rights under the ADA and Rehabilitation Act in three ways: (1) by fully excluding MR. GALLEY from participation in the COUNTY's services, programs, or activities for jail inmates with substance use disorders such as alcohol dependence; and/or (2) by otherwise discriminating against MR. GALLEY with regard to

the COUNTY's services, programs, or activities for jail inmates with substance use disorders such as alcohol dependence; and/or (3) by denying MR. GALLEY -- as a jail inmate deprived of the ability to secure his own medical care and treatment -- reasonable modifications or accommodations for his substance use disorders, including alcohol dependence and risk of severe and life-threatening alcohol withdrawal.

93.     Defendant COUNTY completely denied MR. GALLEY of any benefits, medical, or other services, or accommodations for his disability, thereby placing him at a more acute risk of harm and death than non-disabled inmates.  By and through its systematic delay or denial of medical services for pretrial detainees disabled by substance dependence/addiction and at great risk of withdrawal, Defendant COUNTY demonstrated such wanton disregard for such disabled inmates' care that the outright denial of medical care can be found to be based on their disabled status.

94.     Defendant COUNTY also discriminated against MR. GALLEY by failing to place him in a setting, and/or failing to provide appropriate services, to reasonably address his disability and disability-related medical needs.  Defendant COUNTY thereby subjected MR. GALLEY to both disparate treatment and disparate impact based on his disability class as a substance addicted person at risk for severe and life-threatening withdrawal.  Defendant COUNTY's failure to reasonably address MR. GALLEY's disability and disability-related medical needs caused him to suffer greater injury and indignity in his incarceration in the County Jail than other non-disabled inmates and pretrial detainees.

95.     Obvious accommodations for MR. GALLEY's disability at that time would have included, among others: placing MR. GALLEY on detoxification and withdrawal protocols; having qualified medical staff conduct CIWA assessments on MR. GALLEY every 4 to 6 hours  for at least five days; placing MR. GALLEY on a vitamin regimen, including vitamins such as thiamine, folic acid, and multivitamins; requiring jail and/or medical staff to conduct visual observations of MR. GALLEY multiple times per day; and placing MR. GALLEY on a fixed-dose medication treatment regimen (also known as a "front-loading regimen") for alcohol withdrawal, rather than symptom-

triggered treatment, just as the Court Experts appointed in *Mays* had advised Defendant COUNTY on multiple previous occasions, due to Defendant COUNTY's repeated failures to properly monitor inmates and pretrial detainees like MR. GALLEY for alcohol and other substance withdrawal. Defendant COUNTY failed to provide any accommodations for MR. GALLEY's alcohol dependence and risk of severe and deadly alcohol withdrawal.

96.     Defendants, through their employees and agents, acted as described in this Complaint despite knowing, at all relevant times, that MR. GALLEY was a qualified individual under the ADA and RA with a disability that subjected him to risk of serious injury and death due to alcohol withdrawal, if not properly monitored and treated.

97.     Thus, due to Defendant COUNTY's failure to reasonably address and accommodate MR. GALLEY's disability, and Defendant COUNTY's conduct and decisions that had a disparate impact on him and other similarly disabled individuals, causing MR. GALLEY to suffer greater injury and indignity than other non-disabled inmates, Defendant COUNTY effectively treated non-disabled inmates more favorably than individuals like MR. GALLEY with substance use disorders.

98.     As a result of the acts and omissions of Defendant COUNTY complained of herein, MR. GALLEY suffered from untreated alcohol withdrawal and died, and Plaintiffs have suffered, and will continue to suffer damages and injuries as alleged above.  Plaintiffs sustained serious permanent injuries and are entitled to damages, penalties, costs, and attorney's fees as set forth above in ¶ 42 and 42 U.S.C. § 12205, 28 C.F.R. §35, et seq., and 29 U.S.C. § 794, et seq.  Plaintiffs do not seek punitive damages against Defendant COUNTY.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

1.   Compensatory and exemplary damages in an amount according to proof and which is fair, just, and reasonable;

2.   Punitive damages under 42 U.S.C. § 1983, federal law, and California law including California Civil Code § 3294, in an amount according to proof and which is fair, just, and reasonable against all Defendants except the COUNTY;

3.   All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; 42 U.S.C. § 12205 and 28 C.F.R. §35, et seq., 29 U.S.C. § 794, et seq.; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law;

4.   Declaratory and injunctive relief, including but not limited to the following:

    i.   An order requiring Defendants to institute and enforce appropriate and lawful training, supervision, policies, and procedures for handling persons with serious medical needs concerning alcohol and/or drug dependence and substance use disorders at COUNTY's jails; and

    ii.   An order requiring Defendants to create and follow treatment plans for all alcohol and/or drug dependent detainees and inmates.

5.   Such further relief, according to proof, that this Court deems appropriate and lawful.

### JURY DEMAND

Plaintiffs hereby demand a jury trial in this action.

Dated:  April 21, 2023        HADDAD & SHERWIN LLP

                    /s/ *Michael J. Haddad*

                    MICHAEL J. HADDAD
                    Attorneys for Plaintiffs

# EXHIBIT A























